IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Mona L. Belcher, | ) | C/A. No. 1:03-253-RBH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| Kimberly-Clark Corporation and Kimberly-Clark Corporation Pension Fund, | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

In this case, the parties have agreed that the plaintiff seeks total and permanent disability pension and health insurance benefits pursuant to 29 U.S.C. § 1132(a)(1)(B) under an employee welfare benefit plan, the Kimberly-Clark Corporation Pension Plan, pursuant to plaintiff's employment with Kimberly-Clark Corporation. Additionally, plaintiff seeks an award of attorney's fees. Defendants contend plaintiff is not entitled to the relief sought.

## Procedural Background

This matter is before the Court pursuant to the parties' Joint Stipulation, wherein it was agreed that the Court may dispose of this matter based upon the Joint Stipulation, the administrative record, the plan documents, and each party's memorandum in support of judgment.[1] The Complaint in this case was filed on January 24, 2003 in this court as an action under the Employee Retirement Income Security

---

[1] The Fourth Circuit has recognized that there is no prohibition against the parties agreeing to do away with the summary judgment standard and simply allowing the court to dispose of a matter on its' merits by way of stipulation. See *Bynum v. CIGNA HealthCare of North Carolina, Inc.*, 287 F.3d 305 (4th Cir. 2002), footnote 14, where the court stated:
> "While the parties' agreement to waive the summary judgment standards and submit their case to the district court on its merits seems to be unique, the ERISA statute does not preclude such an agreement. *See also Tester v. Reliance Standard Life Ins. Co.*, 228 F.3d 372, 374, 377 (4th Cir. 2000) (affirming decision of district court after bench trial where parties agreed for court to decide ERISA claim on merits and doing away with summary judgment standard.)."

1

Act of 1975, 29 U.S.C. § 1001, *et seq*. ("ERISA"). Defendants timely answered the Complaint, denying the material allegations therein and raising several affirmative defenses. After initiation of this action, Aetna conducted an administrative review of the plaintiff's claim and concluded that she was totally disabled under the terms of the Kimberly-Clark Long Term Disability Plan. Accordingly, an Order was entered on July 8, 2004 dismissing the action as to defendants Kimberly-Clark Corporation Long-Term Disability Plan and Aetna. The plaintiff seeks an order of the Court requiring the remaining defendants to pay disability pension benefits and health insurance under the group plan. Kimberly-Clark is Plan Sponsor and Plan Administrator.

**Factual Summary**

The plaintiff was employed for twenty-two (22) years at the Kimberly-Clark plant in Beech Island, South Carolina as a process operator assembling diapers. Plaintiff's work involved "lifting 11 to 25 pounds frequently, twisting, bending, squatting, overhead reaching, gripping, sitting, standing, walking and pushing." ( KCC00002). She alleges that she ruptured a disc while at work on April 20, 1998 at the age of 50.

Plaintiff consulted her attending physician in April of 1998 with complaints of severe low back pain following a fall at work. She underwent a complete L-4 laminectomy, medical facetectomy and foraminotomy and right L4-5 diskectomy in August of 1998. She continued to have severe pain, and in December of 1998 she was prescribed physical therapy. In January of 1999, her attending physician gave her an epidural steroid injection in her back. In October of 1999, she received a S-1 and L-5 nerve block. In January of 2000, an independent medical examination was performed by a neurosurgeon, resulting in denial of disability benefits beginning January 27, 2000. (KC00007) On May 25, 2000,

the plaintiff applied for pension disability benefits contending that she was unable to return to her job due to lower back pain and numbness in her lower left leg and foot.

**Plaintiff's Medical Evidence**

Plaintiff submitted several reports by her neurosurgeon, Dr. Gregory Oetting.  During treatment in the months after surgery in a report dated April 15, 1999, Dr. Oetting notes that "neurologic examination is actually relatively normal as far as motor/sensory, but she does have a fair amount of mechanical back pain. She has negative straight leg raise on both sides with negative cross straight leg raise. She does have evidence of cogwheeling on her examination and some malingering sign." He also states that he thinks that she is doing well from a physical standpoint but that she is depressed because of continued "perceived complaint of back pain."  He further states, "I understand that she is applying for disability at this time which I think is appropriate." KCC00025.  Dr. Oetting also completed a form at the request of Cuna Mutual Group dated February 10, 1999, in connection with her credit disability insurance claim. The form requested the date the patient would be released to return to work, and the doctor responded, "Never--See FCE." He also found that the patient was disabled from performing any occupation on question 7 thereof.  KCC00027.     Plaintiff additionally  submitted a Physician's Statement and Impairment Detail Form completed by Dr. Oetting dated May 9, 2000.  On the form, Dr. Oetting checked "neurological system" as an area of impairment.  He also checked "no" as to whether she was a candidate for rehabilitation and whether job modification was appropriate. He attached a functional capacity evaluation (FCE) completed by a physical therapist at Walton Rehabilitation Hospital in Augusta, Georgia on March 16, 1999. The therapist stated that, although she "demonstrated good effort throughout the evaluation," she "does not meet NIOSH standards for any level of employment."  The report continues:

> Deficits in positional tolerance, lifting, bending, and walking limit her ability to perform her job as a process operator.
>
> She demonstrated poor symptom control using passive modalities during the evaluation. Ms. Belcher would be a good candidate for a comprehensive pain management program to improve her active control of symptoms and increase her functional abilities.

KCC00013.

Dr. Oetting referred the plaintiff to the Pain Relief Center where she consulted Dr. Todd D. Cable. His report dated May 24, 1999 indicates that the plaintiff "ambulates with extreme caution taking tiny steps while holding her right hip with her right hand. Her gait is very exaggerated reportedly secondary to her degree of pain. She is able to ambulate without assistance even though she prefers to use a cane in her left hand." KCC00022. The report also states:

> **Pertinent Findings:** Posture shows loss of lumbar lordosis with cephalo-forward positioning of head. She is very deconditioned with generalized muscle tenderness with virtually any motion as well paravertebral muscles in the low thoracic and lumbar region. Range of motion is greatly diminished. Flexion-25 degrees. Extension-20 degrees. Side to side bending and side to side rotation were refused secondary to exacerbation of pain. This is inconsistent with her ability to arise from a seated position as well as to get onto the examining table under her own power.
>
> Straight leg raises were difficult to evaluate secondary to patient's report of pain with as little as 5-10 degrees off of the horizon on the right leg with 30 degrees on the left. These both produced low back pain with no complaints of radicular pain. She reports inability to pull knees up to chest secondary to low back pain. She also refused Faber Exam secondary to low back pain. Straight leg raises in the seated position were negative bilaterally. KCC00022-23

Dr. Cable indicated that the plan for the patient was to have nerve blocks at the L-3, L-4, and sacral ala notch bilaterally. He also recommended pool aerobics and stated that possibly selected nerve

4

root blocks could be performed. He prescribed medication and advised the plaintiff to continue with her psychologist regarding coping mechanism.

Plaintiff also submitted a Physical Residual Functional Capacity Questionnaire dated May 21, 2000, which was completed for purposes of her Social Security disability application, by Dr. Benjamin L. Rucker, an internist in August, Georgia. (KCC00014) Question nine of the questionnaire asked whether the patient was a malinger and the examiner responded "no." The examiner indicated that the patient could only sit or stand for 30 minutes at a time, and could only sit or stand a total of less than two (2) hours in an eight (8) hour working day.

Aetna Health Care requested Medical Consultants Network, Inc. to schedule an Independent Medical Examination on the plaintiff which was performed on January 17, 2000 by Dr. Ildemaro Volcan. Dr. Volcan stated in his report:

> The physical exam revealed a 51 year old female who seems to seems to magnifying all her symptoms. She sits in the chair grabbing the walking stick that she has, and when I asked her to walk, she puts all the pressure on the stick and shakes the right leg as if didn't have any strength in it. When she tried to walk on her tiptoes, she stopped and claims that she can't. The same for walking on heels and squatting down. Nonetheless, she is able to go halfway down supporting her weight. When I asked her to bend over, she wouldn't comply because of the "excruciating back and right leg pain," and she started to cry. In the sitting position, the straight leg raising on the left side is negative and on the right side she complains of back pain. In the supine position if I bent the hip, meaning hip flexion and knee flexion, the patient would cry, indicating there is exacerbation of the pain in the lumbar region, and it was the same for any type of movement in the right leg. The Patrick's maneuver produced back pain, no hip pain. At no point was I impressed with any radicular signs on this patient. There is no atrophy of any group of muscles in the lower extremities. No focal segmental weakness was detected on hip flexion-extension, knee flexion-extension, plantar flexion, or dorsi flexion. In the upper extremities, there is no drift to the outstretch of the arms. Deltoids, biceps, wrist extensors, and flexors were 5/5 bilaterally. The deep tendon reflexes are two+ for biceps, triceps, and knees. The ankle is slightly

> deceased on the right side. She has a good position sense and vibration sense all over. There is no evidence of any type of hypalgesia. KCC00039

Dr. Volcan indicated that the MRI Scan performed in late 1998 indicated no evidence of any compression. His overall impression of the patient was that the neurological exam was "pretty much normal despite the excruciating pain that the patient has." He stated, "from the neurosurgical standpoint, I think this patient should be able to return to her usual occupation. I doubt this is going to be possible based on the behavior that she exhibited while in the office... certainly I do believe there were preexisting problems in that area, which were basically aggravated following the natural history of degenerative disc diseases and spondylosis of the spine." KCC00039. Dr. Volcan completed a Physical Capabilities Form on January 17, 2000 which found no restrictions on the patient's ability to sit, stand or walk during work shift. He also completed a Disability Determination Summary Form on the same date indicating a diagnosis of back pain and lumbar spondlosis, but stated that the employee is able to return to work without modification as of that date.

Internist Dr. Wynonah Rebagay submitted a report to the Georgia Department of Human Resources Division of Rehabilitation Services on April 27, 2000 which has been made a part of this record .Dr. Rebagay reported that the patient experienced "severe pain on slight pressure along the L-4 - S-1 area" and that she had "very limited range of motion along the hip joint." Her assessment was as follows:

> 1: CHRONIC LOW BACK PAIN SECONDARY TO STATUS POST FAILED BACK SURGERY, currently being maintained on pain medications. The patient now has been released from the care of a neurosurgeon and has been under the care of a local private practitioner. **This patient has essentially lost her function from the hip area down to her lower extremities. Her ability to ambulate and use the lower limbs has been severely compromised**. She will eventually be a total

>care patient should her neurological conditions deteriorate. (emphasis added)

KCC00054.

## **Kimberly-Clark Pension Plan Committee**

The Pension Plan Committee for the Kimberly-Clark Corporation Pension Plan reviewed the medical records and other documents submitted by the plaintiff (without counsel) and denied total and permanent disability pension benefits by letter dated July 31, 2000. The letter denies the benefits on the basis of a finding that the plaintiff has not shown that she met the definition in the plan of total and permanent disability.

Section 2 of the Pension Plan provides:

(a)  <u>Employee's Benefit</u>:  An Employee who has 5 Years of Vesting Service. . . shall be eligible for Disability Benefits upon termination of his employment if (l) the termination of his employment shall be by reason of his having become Totally and Permanently Disabled . . .

Article X ,Section 10.1(r) of the plan defines "totally and permanently" as "a condition arising out of injury or disease which the committee determines as permanent and prevents an employee from engaging in any occupation with his employer commensurate with his education, training and experience..."

The Committee found that there was a lack of medical documentation showing "objective evidence of the cause for your pain" and found that the condition was not permanent and that the plaintiff could engage in an occupation with Kimberly-Clark commensurate with her education, training and experience.[2] "None of your doctors were able to conclude that your condition is permanent or that

---

[2] The letter does not indicate what occupation the plaintiff could perform, commensurate with her education, training, and experience.  The Court notes that the handwritten letter that the plaintiff submitted to the committee does not reveal a high level of education.

you are at maximum medical improvement. Therapy and medication remain viable treatment options which may improve your condition and enable you to work again." KCC00088.

Plaintiff appealed the denial and Kimberly-Clark again denied benefits on June 25, 2001. The second letter states that the committee denied the claim based on inconsistent reports from the treating physicians. The committee again stated that it was unable to determine if the condition was permanently and totally disabling and prevents her from engaging in any occupation with Kimberly-Clark consistent with her education, training and experience.

Plaintiff submitted additional information, through counsel, and Kimberly-Clark granted a special review of the application on October 21, 2001. Kimberly-Clark again denied the application on January 18, 2002. The letter indicates that the only additional information submitted was a Physical Residual Functional Capacity Questionnaire completed by Dr. Rucker dated October 17, 2001 with substantially the same answers as the first one that he completed. The committee noted that Dr. Rucker did indicate that depression and emotional factors no longer contributed to the severity of the symptoms; that the plaintiff's ability to walk without rest or pain increased from one city block to two city blocks; and that the standing limitation decreased from 30 to 15 minutes. The letter notes that there was significant improvement to the percentage of time in an eight-hour day that she could use her hands and fingers for grasping, turning and twisting from 0 to 80%. The committee stated:

> However, the committee received no objective evidence demonstrating nerve compromise or neurological deficits which indicate a permanent disability, such as a physical examination finding such as weakness, muscle atrophy, asymmetric reflexes or poor or uncoordinated function, an EMG documenting abnormal nerve or muscle function, or evidence on MRI, Mylogram, or CT Scan showing direct nerve compression that would support your physicians' clinical findings. KCC00093.

**Discussion of the Law**

**Standard of Review**

The plaintiff contends that Kimberly-Clark is the administrator of the pension plan and also contributes to the trust, keeping it solvent in such amounts and at such times as Kimberly-Clark shall from time to time determine. KCC000195 ¶ 5.3. Further, plaintiff asserts that the committee is run by Kimberly-Clark and that the committee consists of officers, directors and/or employees of the company. The plaintiff believes that a modified abuse of discretion standard applies. The defendants contend that the proper standard of review is an abuse of discretion standard. (Amended Jt. Stip. ¶ 2).[3]

The abuse of discretion standard applies "where the benefit plan grants the administrator or fiduciary discretionary authority to determine eligibility or to construe the terms of the plan." Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228, 232 (4th Cir. 1997). Under an abuse of discretion standard, a decision will not be disturbed if it is reasonable, even if the Court disagrees with the ultimate decision. Feder v. Paul Revere Life Ins. Co., 228 F.3d 518, 522 (4th Cir. 2000). When an administrator is granted discretion by the terms of an ERISA plan

> a court reviews the administrator's decision to deny benefits for an abuse of that discretion, asking whether the denial of benefits was reasonable, Bernstein v. CapitalCare, Inc., 70 F.3d 783, 787 (4th Cir. 1995) (citations omitted), "based on the facts known to [the administrator] at the time." Sheppard v. Enoch Pratt Hosp., [Inc., 32 F.3d 120,] 125 [(4th Cir. 1994)]. An administrator's decision is reasonable "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence. Bernstein, 70 F.3d at 788.

---

[3] The pertinent plan document provides that the Pension Plan Retirement Committee shall have:
   ...all such powers as may be necessary to discharge its duties which are as follows: to construe or interpret the Plan, to determine all questions of eligibility, to compute the amount and determine the method of payment of any Benefits and to perform such other duties as are delegated to it under the Plan or Trust or as may from time to time be delegated to it by the Retirement Trust Committee .... The Committee shall exercise the powers granted to it under the Plan in its sole discretion.
   .
(Jt. Stip. ¶ 3, citing Ex. 1, p. KCC00194, §6.2.

Stup v. Unum Life Ins. Co. of America, 390 F.3d 301, 307 (4th Cir. 2004).

The court may apply a modified standard and afford somewhat less deference to the plan administrator or fiduciary's decision, even when the plan language grants sufficient discretionary authority to warrant a deferential review under the abuse of discretion standard, if the administrator or fiduciary is operating under a substantial conflict of interest. See Booth v. Wal-Mart Stores, Inc. Assoc. Health & Welfare Plan, 201 F.3d 335, 343 n. 2 (4th Cir. 2000)(in addition to serving as a factor in the reasonableness inquiry, a fiduciary's conflict of interest may operate to reduce the deference given to fiduciary's benefits decision). Ellis v Met. Life Ins. Co., 126 F.3d 228, 233 (4th Cir. 1997)(where plan administrator or fiduciary is operating under a conflict of interest, the conflict must be weighed as a factor in determining whether the administrator abused its discretion).

In analyzing whether a conflict of interest exists the court should consider whether a particular claim decision had the potential to further the financial interests of the administrator or fiduciary charged with making that decision. See Ellis, 126 F.3d at 233; Taliaferro, 112 F. Supp 2d at 499 (where entity with discretionary authority also has a financial interest as the actual insurer, a conflict of interest may exist). "The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it." Ellis, 126 F.3d at 233 (in the face of a demonstrated conflict of interest, court must modify the abuse of discretion standard to the degree necessary "to neutralize any untoward influence resulting from the conflict").

In the case at bar, Kimberly-Clark is the plan administrator and makes contributions to a trust. Assets of the plan are held in the trust. "No part of the assets may be returned to the company" unless the plan is terminated and all liabilities have been satisfied. (KCC00198) The Retirement Committee

is composed of at least three representatives from various business entities within Kimberly-Clark. The Committee reviews applications for benefits under the plan, interprets plan provisions, and makes eligibility decisions.

The court finds that the modified abuse of discretion standard is not appropriate in this case. The Fourth Circuit has held that "the simple and commonplace fact that a plan's administrator is also its funder is not enough to support a finding of a conflict of interest that would cause an adjustment to our deference . . . We question how a company that creates, funds, and administers a plan for its own employees' benefit can, from those facts alone, be presumed to have a financial conflict in administering that plan when the company remains free to end the plan altogether." Colucci v. AGFA Corp. Severance Pay Plan, 431 F.3d 170, 179 (4th Cir. 2005).[4]  See also, de Nobel v. Vitro Corp., 885 F.2d 1180 (4th Cir. 1989).[5]  Moreover, in the case at bar, there is no showing of unfair evidence or improper motives by committee members who were also employees of the company.

**Scope of the Evidence**

Since the appropriate standard of review in this case is abuse of discretion, this Court's review is limited to the evidence that was before the claims administrator at the time of the decision. See Sheppard v. Enoch Pratt Hospital v. Travelers Ins. Co., 32 F.3d 120, 125 (4th Cir. 1994); see also Bernstein, 70 F.3d at 788 ("[W]hen a district court reviews a plan administrator's decision under a

---

[4] A conflict of interest may be present when an administrator "who was *closely* aligned with the plan sponsor's leadership, relied on *biased* information provided by the plan's sponsor . . [The employee] offers no evidence that the Committee was exposed to unfair evidence or that the Committee's members were so closely aligned with AGFA's leaders (assuming the leaders had improper motives) that we should impute improper motives to the Committee's members." Colucci, 431 F.3d at 180.

[5] "That plan administrators' decisions have had a favorable impact on the balance sheet of the trust itself, however, suggests no 'conflict of interest.'" de Nobel, 885 F.2d at 1191.

11

deferential standard, the district court is limited to the evidence that was before the plan administrator at the time of the decision.").

**Analysis**

The question before the Court is whether Kimberly-Clark abused its discretion in concluding that the plaintiff failed to show she was disabled under the terms of the plan. After reviewing the administrative record and applying the abuse of discretion standard of review, the Court concludes that Kimberly Clark's decision in the instant case was based upon "substantial evidence" or, in other words, "evidence which a reasoning mind would accept as sufficient to support a particular conclusion", and not an abuse of discretion. See LeFebre v. Westinghouse Elec. Corp., 747 F.2d 197, 208 (4th Cir. 1984) (*quoting* Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

A participant's entitlement to an "award of benefits under an ERISA plan is governed in the first instance by the language of the plan itself." S.S. Trade Ass'n Int'l Longshoreman's Ass'n v. Bowman, 247 F.3d 181, 183 (4th Cir. 2001). In other words, the written language of an employee benefit plan determines an employee's entitlement to benefits and the amount of those benefits. See Dameron v. Sinai Hospital Baltimore, Inc., 815 F.2d 975, 978 (4th Cir. 1987); Pizlo v. Bethlehem Steel Corp., 884 F.2d 116 (4th Cir. 1989). Kimberly-Clark is obligated to plan participants to follow the written terms and conditions of the plans in reviewing pension disability claims. See 9 U.S.C. § 1104(a)(1)(D); Pegram v. Herdich, 530 U.S. 211, 223-24(2000).

The defendants denied the plaintiff's claim for disability pension benefits on the basis that the medical evidence was contradictory and did not prove that she was permanently disabled. (They also found that the plaintiff could perform another job with the company, although they did not state what job(s) she was qualified to perform.)

In reviewing the medical evidence, the Court believes that the finding by Kimberly-Clark that the plaintiff did not prove that she was permanently disabled is supported by substantial evidence, was reasonable, and did not constitute an abuse of discretion. Evidence which supports this finding includes: (1) Dr. Volcan's opinion that, although the plaintiff suffers from pain, she could still return to work; (2) the FCE by the physical therapist indicating she was a good candidate for a pain management program to improve symptoms and functional abilities; and (3) the pain management specialist's recommendation of pool aerobics and nerve root blocks.

While Dr. Oetting and Dr. Rebagay's findings are favorable to the plaintiff, it cannot be said in light of the other evidence or lack thereof as to permanency, that the defendant's decision was unreasonable or was an abuse of discretion. The substantial evidence is consistent with the committee's finding of no permanency and that she had not reached maximum medical improvement. There is no question that the plaintiff has a serious, limiting condition. However, the question is permanency. The Court finds that the substantial evidence supports the findings of the committee that the plaintiff did not prove permanent disability. Therefore, it is not necessary to determine whether there are jobs at Kimberly-Clark that the plaintiff would be able to perform.

Plaintiff attempts to bolster her case that she is disabled by submitting that she has been determined to be disabled and is currently receiving disability benefits from the SSA. The United States Supreme Court and the Fourth Circuit have held that an ERISA fiduciary is not bound by the SSA's decisions. Elliott v. Sara Lee Corp., 190 F.3d 601 (4th Cir. 1999) ("Social Security Administration's determination that plaintiff was disabled did not address issue of 'total disability' because definition of 'total disability' under benefit plan did not mirror relevant definition under SSA regulations").

13

Therefore, in reaching its decision, this Court has not considered, much less relied on any decisions or conclusions reached by Aetna or the SSA.

## Conclusion

Based on the evidence before Kimberly-Clark, the Court concludes that there was a reasonable basis for finding that the plaintiff was not entitled to benefits under the provisions of the plan. The Court finds that Kimberly-Clark did not abuse its discretion and, accordingly, the defendants are entitled to judgment in this case. It is therefore **ORDERED** that Defendants are granted judgment in their favor.

**IT IS SO ORDERED**.

s/ R. Bryan Harwell
R. Bryan Harwell
United States District Judge

Florence, SC
March 31, 2006